**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

J.W.C. by his Next Friend, Austin Campbell,
And Tierra Frieson,

      Plaintiffs,

v.                                     Civil Action No. 2:22-cv-496

Camden Clark Physicians Corporation, et al.

      Defendants.

## <u>ORDER APPROVING SETTLEMENTS, DISTRIBUTIONS AND OTHER RELIEF</u>

On the 2nd day of December 2024, counsel for Plaintiffs David A. Sims appeared in person along with Austin Campbell, father and Next Friend of J.W.C., an incapacitated minor, and Tierra Frieson, individually and as J.W.C.'s natural mother. Defendants Camden-Clark Physician Corporation, incorrectly named as "Camden Clark Physicians Corporation" and Eric Lowden, M.D. appeared by their counsel Mark A. Moses. Defendant Camden-Clark Memorial Hospital Corporation, incorrectly named as "Camden Clark Memorial Hospital Corporation a/k/a Auxiliary of Camden Clark Memorial Hospital of Parkersburg, Inc." appeared by its counsel S. Andrew Stonestreet. Natalie Rose Atkinson, the Court appointed Guardian Ad Litem, appeared in person. All appeared before this Court pursuant to this Court's Notice of Hearing setting this matter on said date to consider the Petition to Approve Settlements, Distributions and Other Relief.

### I. Background

**A. Facts**:

This case involves an alleged birth injury to J.W.C. and alleged stroke injuries to his mother Tierra Frieson. Tierra Frieson was nineteen years of age when she delivered J.W.C. at 40 weeks' gestation. She received prenatal care throughout her pregnancy from Eric Lowden, M.D. On June 26, 2018, Ms. Frieson presented at Camden Clark Memorial Hospital for elective

1

induction of labor. She was started on Cervidil for cervical ripening, followed by Pitocin starting on the morning of June 27, 2018. Plaintiffs alleged that monitoring on June 27, 2018, showed persistent tachysystole and changes in the fetal heart rate that warranted reducing or discontinuing Pitocin and earlier delivery of J.W.C. via Cesarean section. Plaintiff alleged Dr. Lowden and the nursing staff breached the standard of care when they failed to do so. Defendants disagreed and contended that all care providers complied with the standard of care.

J.W.C. was delivered by spontaneous vaginal delivery at 2:03 a.m. on June 28, 2018 and was subsequently transferred to Ruby Memorial Hospital in Morgantown, West Virginia. Plaintiffs alleged that J.W.C. experienced hypoxic ischemic injury during labor and delivery, and that his neonatal course and neuroimaging support that conclusion. Defendants disagree that J.W.C. experienced permanent injury and disagreed with Plaintiffs' interpretation of J.W.C.'s neonatal course and neuroimaging.

On July 6, 2018, Ms. Frieson presented to the Emergency Department at Ruby Memorial Hospital with complaints of headache, blurry vision, dizziness, vomiting, and high blood pressure. Ms. Frieson underwent serial neuroimaging studies including a brain CT on July 6, 2018 which was interpreted as demonstrating "acute intracranial hemorrhage with a intraparenchymal hematoma seen in the right parietal lobe…" Ms. Frieson also underwent a brain MRI on July 6, 2018, which was interpreted as demonstrating acute intraparenchymal hemorrhage in the right parietal lobe; edema within the bilateral parietal lobes, basal ganglia, and adjacent white matter tracts; and mild hydrocephalus involving the left lateral ventricle. Ms. Frieson remained admitted at J.W. Ruby Memorial Hospital until her discharge on July 11, 2018. Plaintiffs alleged that negligence during Ms. Frieson's labor and delivery and postpartum caused her to suffer these complications. Defendants disagreed and contended that Ms. Frieson's complications were unforeseeable and that Defendants at all times complied with the standard of care.

J.W.C. is now six years old. He lives with his mother, father, and younger brother in Parkersburg, West Virginia. J.W.C. exhibits severe neurological dysfunction and developmental delays. At school, he has a full-time aide and spends his time in a self-contained classroom. J.W.C. can run and walk normally and feed himself, but is completely nonverbal, does not make eye contact, and does not interact with peers. J.W.C. pinches and bites strangers and family members. He does not communicate in words, preferring to express his needs by gesture or behavior. He pinches or grabs adults to gain their attention, and points on occasion.

The parties agree that J.W.C.'s condition is consistent with an autism spectrum disorder. Plaintiffs contended that his patterns of limited communication as well as poor reciprocal social interaction and restriction, and repetitive behaviors were consistent for a pattern of traumatically induced autism spectrum disorder, which Defendants disputed. Defendants and their experts contended that "traumatically induced autism spectrum disorder" is not a concept accepted within the scientific community, and that no scientific basis exists for a conclusion that injury during labor and delivery causes autism. However, the parties all agree that J.W.C. will never be able to live independently. The parties agree that J.W.C. is not likely ever going to be employable and will likely require 24-hour assistance and supervision for the remainder of his life.

As noted previously, Plaintiffs allege that Tierra Frieson has developed her own acute medical problems relating to the birth of J.W.C. Plaintiffs contend that she has suffered a permanent neurologic injury related to her condition, which they allege will require medical care for her throughout her life and will allegedly likely render her non-employable. Defendants disputed this.

J.W.C.'s medical insurance has been provided by Medicaid programs. Medicaid paid for J.W.C.'s medical expenses in West Virginia, and for his care in Florida, where Plaintiffs moved

3

following J.W.C.'s birth. Tierra Frieson's medical care has been paid for by West Virginia's Medicaid program. West Virginia's Medicaid program and Florida's Medicaid program have both placed liens on any claim J.W.C. has based on his alleged birth injuries as well as liens on payments for the injuries that Ms. Frieson has allegedly sustained. Initially, there was a lien for Thirty Four Thousand, One Hundred Seventy Eight Dollars and Ninety Nine Cents ($34,178.99) for J.W.C.'s care and treatment and a lien in the amount of Fourteen Thousand Nine Hundred Forty Nine Dollars and Forty Four Cents ($14,949.44) for Ms. Frieson's care and treatment. Aetna West Virginia Medicaid's lien for J.W. C. has been reduced to Nineteen Thousand, Two Hundred Nine Dollars and Forty Seven Cents ($19,209.47). Aetna West Virginia Medicaid's lien for Tierra Frieson has been reduced to Eight Thousand Three Hundred Seventy One Dollars and Thirty Two Cents ($8,371.32). Sunshine Health Florida Medicaid's lien has been reduced to One Thousand Three Hundred Twenty Three Dollars and One Cent ($1,323,01). J.W.C. and Tierra Frieson must be able to retain Medicaid insurance benefits for these Plaintiffs to be able to afford treating their lifelong medical needs.

Within months following J.W.C.'s birth, Tierra Frieson sought counsel to represent her in an action based on J.W.C.'s alleged birth injuries and for the injuries that she allegedly sustained. Ms. Frieson signed two contingency fee agreements with David A. Sims, one for her injuries, and the second for the injuries that J.W.C. received. The contingency fee agreements permitted counsel to charge a fee of forty percent (40%) of any recovery had by each of the Plaintiffs, plus any expenses for the prosecution of these actions. Each of those contingency fee agreements permitted David A. Sims to retain other counsel to participate in the prosecution of any claims or lawsuits. Mr. Sims then sought the assistance of Jack M. Beam and Matthew M. Patterson of the Beam Legal Team, LLC to assist in the prosecution of the Plaintiffs' claims. Ms. Frieson was notified in writing of the participation of the Beam Legal Team, LLC and consented to the same, including

notification that the attorneys' fees of forty percent (40%) would be split evenly between the two firms.

**B. Procedural History**:

Plaintiffs filed suit in this Court on October 28, 2022. (ECF No. 1.) On February 24, 2023, the Court entered a Scheduling Order setting a discovery schedule and trial date of November 19, 2024. (ECF No. 35.) After discovery commenced, Plaintiffs hired experts in obstetrics and gynecology, labor and delivery, maternal fetal medicine, causation, nursing standards of care, and economics. Defendants hired numerous experts in the same fields, as well as an expert on autism spectrum disorder. Numerous expert depositions took place across the country. The information from these depositions was gathered and used to prepare for trial, both of which took substantial time and effort. The Court notes that Defendants have strongly contested liability, causation and damages in this case and disputed many of the allegations made by Plaintiffs during this litigation. However, after all this discovery, the parties were able to resolve their differences and filed a joint notice of settlement on August 28, 2024. (ECF No. 117). Plaintiffs then filed their petition to approve the settlement on October 8, 2024. (ECF No. 121.)

The Court appointed Natalie Rose Atkinson as Guardian Ad Litem ("GAL") pursuant to Federal Rule of Civil Procedure 17(c), to protect the interests of J.W.C., a minor plaintiff whose father Austin Campbell is suing on his behalf as next of friend, consistent with Fed. R. Civ. P. 17(c)(2) which permits a "minor or an incompetent person who does not have a duly appointed representative to sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action." The GAL conducted interviews, reviewed pleadings, depositions, and analyzed the proposed settlement, expenses and distributions. Based upon her work, the GAL then

prepared a report and filed the same with this Court. (E.C.F. No. 126).

The parties sought this Court's approval of the settlements, to make certain distributions for attorney's fees, expenses, reimbursement of liens and the creation of Special Needs Trusts for J.W.C. and Tierra Frieson.

According to the Petition, the parties have agreed to resolve the claims of J.W.C. and Tierra Frieson by the payment of a confidential amount. The parties proposed structuring the settlements as follows:

(1) an irrevocable special needs trust for the benefit of J.W.C., which meets the requirements of 42 U.S.C. §1396p(d)(4)(A), as amended on August 10, 1993, by the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, and 42 U.S.C. §1382(e), and subsequent regulations duly promulgated in compliance with the Federal and State enabling statutes and regulations including 20 C.F.R. §§416.1100, 1121, 1141 et seq., and guidelines including the POMS, e.g. SI 01120.201 and SI 01120.203B;

(2) an irrevocable special needs trust for the benefit of Tierra Frieson which meets the requirements of 42 U.S.C. §1396p(d)(4)(A), as amended on August 10, 1993, by the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, and 42 U.S.C. §1382(e), and subsequent regulations duly promulgated in compliance with the Federal and State enabling statutes and regulations including 20 C.F.R. §§416.1100, 1121, 1141 et seq., and guidelines including the POMS, e.g. SI 01120.201 and SI 01120.203B; and

(3) the purchase of two annuities for the benefit of J.W.C. using gross settlement proceeds. The balance of the settlement proceeds will be used to pay certain expenses, and what is left after expenses would be placed into the special needs trust for J.W.C. and a sum certain to the special needs trust of Tierra Frieson.

The following expenses were discussed and approved:

(1)     the medical liens resulting from medical care for J.W.C.'s alleged birth injuries and Tierra Frieson's alleged injuries in the amount of $28,903.80;

(2)     payment of litigation expenses incurred by Plaintiffs' counsel totaling $307,189.94;

(3)     reimbursement by Defendants to counsel for Plaintiffs for the creation of the special needs trusts in the amount of $3,000.00;

(4)     payment of the GAL fees by Defendants; and

(5)     attorney's fees.

For attorney's fees, Plaintiffs' counsel requested contingency fees at 40% of the total settlement. Plaintiffs' counsel also proposed that they retain $50,000 for ninety days to pay any unexpected expenses billed after dispensing the settlement proceeds. After ninety days, Plaintiffs' counsel would pay back any remaining principal plus interest accrued over the ninety-day period to the J.W.C. Self-Settled Special Needs Trust. For the total settlement sum and a clear delineation of its proposed distributions, please see Exhibit A, which is filed under seal.

A hearing on the proposed settlement of Plaintiff's claims was held on December 2, 2024, with all parties and the GAL present. During the settlement hearing, Ms. Frieson testified that she believed the settlement with Defendants is fair and reasonable for her and her son. She also stated that she was satisfied with Plaintiffs' counsel's representation, and that Plaintiffs' counsel had done everything she asked them to do during the representation. Ms. Frieson also understands that this Court's approving the proposed settlement with Defendants will extinguish any claims she and her son hold against Defendants arising out of J.W.C.'s birth and for any injuries or damages that she claims from the same. Austin Campbell, next friend of J.W.C. testified that he believed the settlement is fair and reasonable and in the best interests of J.W.C. and asked the Court to approve

the same.

The GAL prepared a report prior to the hearing and reported at the hearing about the fairness of the proposed settlement. Before the settlement hearing, the GAL discussed the case with Austin Campbell, Tierra Frieson, Plaintiffs' counsel, counsel for the Defendants, a representative from Citizens Bank, and the proposed Trustee of the Special Needs Trusts, and examined certain documents relating to the litigation. Although the GAL could not review every document filed in this case, she reviewed those she deemed most important, including some of the pleadings, the expert witness reports and deposition transcripts, the Petition to Approve and the settlement documents prepared by the parties, expert opinions and plans prepared for J.W.C.'s life care plan and medical management. The GAL's report found, among other things that she believed that a fee of 33.33% is the customary contingency fee for the representation of an infant in proceedings of this complexity; as for the settlement of Ms. Frieson's claims, the GAL found that a 40% fee to be fair and reasonable given that she had the capacity to agree to the fee, where her minor son did not. The GAL Report also found the remaining proposed expenses—medical liens, special needs trusts, two specified annuities, litigation expenses, GAL fees, legal fees for consulting and creating trusts, and Tierra Frieson's settlement award—were fair and reasonable to the minor plaintiff J.W.C. Lastly, Plaintiffs' counsel's request about retaining $50,000.00 of the settlement proceeds for ninety days is a fair and reasonable method of paying any outstanding, unforeseen expenses, according to the GAL Report.

At the hearing, the GAL stated that she believes the settlement is in J.W.C.'s best interests. She indicated her concerns over the 40% contingency fee for J.W.C., but that she would defer to this Court's analysis of the fee arrangement for J.W.C. to determine its reasonableness.

At the settlement hearing, the Court found the total settlement amount for the claims of

8

Tierra Frieson and J.W.C. to be paid by Defendants is fair and reasonable. The GAL and all parties agreed that the proposed settlement, although confidential, will amply provide for J.W.C.'s medical and personal needs for his lifetime. Furthermore, as previously noted, the issues of liability, causation and damages were hotly contested by Defendants. The evidence in Defendants' favor reveals uncertainty about both Defendants' liability and causation for J.W.C.'s injuries and those of his mother Tierra Frieson. Although a jury could have awarded more than the settlement amounts obtained, it also could have awarded less or nothing at all. Accordingly, the Court found that the total of these settlement amounts was a fair and reasonable compromise of the claims against the Defendants.

The Court also found the settlement's structure—as presented by the parties in the Petition and at the settlement hearing and summarized again in Exhibit A—is fair and reasonable. The Court approved using principal settlement proceeds to fund the two special needs trusts, and to purchase two proposed annuities. Together, these purchases will guarantee that J.W.C. will have access to living expenses and adequate medical care for the rest of his life.

As for proposed payments from the gross settlement fund, the Court approved each of these as fair and reasonable. More specifically, the Court approved paying the reduced medical liens, as these expenses were incurred in treating J.W.C.'s alleged birth injuries and the injuries allegedly suffered by Tierra Frieson. Tierra Frieson's portion of the settlement proceeds is fair and reasonable to J.W.C.

Litigation expenses incurred by Plaintiffs' counsel in the amount of $307,189.94 were also approved. Counsel for Defendants agreed that they would reimburse David A. Sims for the payment of legal fees for the creation of the Special Needs Trusts in the amount of $3,000.00. The GAL's fees were approved and are to be billed to the Defendants and paid by them within 15 days

of this Court's Order. Plaintiffs' Counsel's request to retain $50,000.00 of settlement proceeds for ninety days to pay any unexpected expenses that may appear in that time was also approved, and that after the ninety-day period elapses, any remaining principal plus interest shall be repaid by Plaintiffs' counsel into the special needs trust for J.W.C.

The sole remaining issue to be determine is the issue of attorney's fees. The GAL believes that a fee of 33.33% of the recovery for J.W.C. is the customary fee for these kinds of cases involving an incapacitated minor. The GAL stated at the hearing that she would leave the final determination of a fee award to counsel for Plaintiffs in the sound discretion of this Court.

In the Petition and based upon the expert testimony of Arden John Curry, II called by Plaintiffs on the issue of attorney's fees, the testimony of Austin Campbell, father of J.W.C. and the testimony of Tierra Frieson, this Court has sufficient information to enable proper review of the proposed attorney's fees requested in accordance with the twelve factors from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). *See In re Abrams & Abrams, P.A.*, 605 F.3d 238, 243 (4th Cir. 2010) (explaining "[d]istrict courts should look at the twelve factors first set forth in Johnson" when reviewing attorney's fees on claims involving minors). During the testimony adduced at the hearing on the *Johnson* factors,

## II. Legal Standard

Under West Virginia law, this Court is mandated with conducting a review of the attorney fees, costs, injuries to the minor and settlement amounts. *W. Va. Code 44-10-14(g)(1)*. The United States Court of Appeals for the Fourth Circuit has similarly recognized a standard of "reasonableness" in reviewing a request for attorneys' fees, including those relating to contingent fee contracts. *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 243 (4th Cir. 2010). In *Abrams*, the Fourth Circuit noted, "the law of this circuit has long been clear that federal district courts have

inherent power and an obligation to limit attorneys' fees to a reasonable amount." Id. (citing *Bergstrom v. Dalkon Shield Trust* (*In re A.H. Robins Co.*), 86 F.3d 364, 373 (4th Cir. 1996)). This is true even where "the settlement has been recommended or negotiated by the minor's parent or guardian ad litem." *Id.* at 247.

Where a proposed settlement involves a minor, the district court has a "duty to protect the minor's interests," because minors may be "especially vulnerable to manipulation" and "unable to protect themselves." *Abrams*, 605 F.3d at 243. "[I]nvestigation and examination of a proposed minor settlement includes a review not only of the total settlement amount, but also of the disposition of the settlement proceeds, including requested payments to others, such as attorneys or medical providers." *Gorham v. Amusements of Rochester, Inc.*, No. 14–386, 2015 WL 2454261, at *3 (M.D.N.C. May 22, 2015). Regarding attorney's fees on a minor's claim, district courts do not have carte blanche to approve or deny the requested fee, and instead, must scrutinize the fee for reasonableness by applying twelve factors from *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) to evidence before the Court. *Abrams*, 605 F.3d at 243–44.

Even where a parent on behalf of a minor-client has agreed to a fee before the representation, the court must review the agreed upon fee for reasonableness. *See Abrams*, 605 F.3d at 240; *Jenkins v. McCoy*, 882 F. Supp. 549, 555 (S.D.W. Va. 1995); *Gorham*, 2015 WL 2454261, at *3; *see also Blanchard v. Bergeron*, 489 U.S. 87, 92 (1989); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 164 (5th Cir. 1981). An agreed upon fee is but a single factor in assessing the reasonableness of requested attorney's fees and is not dispositive in calculating a reasonable fee. *See Blanchard*, 489 U.S. at 93 (discussing *Johnson* factors in context of fees requested under Civil Rights Attorney's Fees Act). Not all fee agreements will be reasonable. A certain fee for representing an adult client who is fully competent may not be reasonable in a case where the client is an incapacitated minor. *Jackson v. United States*, 3:14-cv-15086, 2016 WL 3826379, at

11

*10 (S.D. W. Va. July 13, 2016) (Chambers, J.).

Applying the *Johnson* factors to the unique circumstances in each case will determine whether a certain fee is reasonable or not. The Fourth Circuit has stated the *Johnson* factors as follows:

> the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the undesirability of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

*Abrams*, 605 F.3d at 244.

### III. Discussion

In the Petition, Plaintiffs ask the Court to approve the settlement that Plaintiffs' counsel negotiated on J.W.C.'s behalf with the Defendants and the payment of a 40% contingency fee. This task requires applying *Johnson's* twelve factors to evidence adduced in this case and determining whether a 40% contingency fee is reasonable, and, if 40% is excessive, setting a reasonable fee.

1.  **Time and labor**. Judging from the time it took to litigate this case, the extent of discovery completed, documents filed, and negotiations conducted, Plaintiffs' counsel devoted substantial time and resources to secure this settlement. This case took a little over two years to prosecute, with counsel for Plaintiffs having represented them since shortly after J.W.C.'s birth. Although it stopped short of trial—a time and resource drain—discovery was completed. Discovery required reviewing voluminous, plentiful medical records and conducting depositions of

12

experts on medical standards of care and causation. According to the Petition and the testimony of Arden John Curry, II, there is little question that the first factor in *Johnson* weighs in favor of the 40% contingency fee.

2.    **Novelty and difficulty of the questions presented**. "Cases of first impression generally require more time and effort on the attorney's part." *Johnson*, 488 F.2d at 718. To be clear though, this factor considers the novelty or complexity of issues of law, not the amount of time put into a case by attorneys, which is the subject of the previous factor, or the expertise required to litigate in a certain field of law, which is considered in the experience factor. This case involved a substantial point of contention over whether a child can suffer from trauma induced autism. As Mr. Curry testified at the hearing, the medical literature is not kind to plaintiffs and *Daubert* challenges are often lost by them. Given the difficulty with proving liability coupled with the issues of causation for J.W.C.'s autism, the second factor in *Johnson* weighs in favor of the 40% contingency fee.

3.    **Skill required**. Under the skill factor, courts consider counsel's work product, preparation, and general ability displayed to the court. *Johnson*, 488 F.2d at 718. Plaintiffs' counsel notes this case required lawyers experienced in liability for birth injuries and for issues involving autism, both of which require great skill. Plaintiffs' expert, Mr. Curry, testified that he has worked with Mr. Sims over many years and that he has acted as co-counsel on cases with him and recognized his skill in the prosecution of these kinds of cases. Furthermore, this Court recognizes that Plaintiffs' counsel has demonstrated expertise in the subject matter underlying this dispute—expertise which led to the settlement amounts reached for these claims. Considering all this, the skill factor weighs in favor of awarding a fee proportionate

13

to better than average work product, preparation, and ability. Thus, the third factor in *Johnson* weighs in favor of the 40% contingency fee.

4. **Preclusion of other employment**. Courts are justified in awarding higher fees to attorneys who demonstrate they sacrificed other lucrative cases to take on the instant representation, and to solo practitioners, who presumably must forgo other cases. *See Williams*, 2015 WL 127862, at *9. As Mr. Curry testified, he knows that Mr. Sims is a solo practitioner and that based upon the volume of work required for this kind of case, it would have to preclude Mr. Sims from taking on other cases. This case's complexity and costs involved severely limit the number of other cases an attorney can take on each year. On this point, the Court is persuaded that this case more likely than not precluded other employment. Thus, the fourth factor in *Johnson* weighs in favor of the 40% contingency fee.

5. **Customary fee for similar work**. Under the customary fee factor, a court looks to the "customary fee for similar work in the community." *Johnson*, 488 F.2d at 718. In this case, the GAL found a customary fee for infant summary proceedings is 33.33%. Case research suggests a 33.3% contingency fee was customary in the Fourth Circuit for medical malpractice cases involving minors or incompetent persons. *See*, e.g., *Williams v. Old HB, Inc.*, No. 13–00464, 2015 WL 127862, at *6 (W.D. Va. Jan. 8, 2015); *Gorham*, 2015 WL 2454261, at *12. In 2024, Mr. Curry testified that lawyers in West Virginia customarily charge 40% in contingency fee cases like this one. While Mr. Curry testified that he sometimes reduces his fee for

early settlements, this case was not settled early and only settled after discovery was completed. Mr. Curry also testified that the caps imposed by the Medical Professional Liability Act make these cases less likely to be settled, thus increasing the likelihood that a case will not be settled until later in the litigation, if at all. This Court is persuaded that the customary fee for these cases has risen over the years and that an award of 40% is now appropriate.

6.   **Contingency of fee**. Under the contingency of fee factor, courts consider counsel's expectations at the outset of litigation regarding the fee rate and risks faced by counsel in undertaking the representation. *Johnson*, 488 F.2d at 718; *Williams*, 2015 WL 127862, at *6. Courts should also factor into their analysis the important role that contingency fees play in providing counsel to clients who are impoverished. *Abrams*, 605 F.3d at 245–46. In this case, Tierra Frieson agreed, on her behalf and her son's, to pay Plaintiffs' counsel 40% on any proceeds from Plaintiffs' claims. No doubt, the contingency fee agreement in this case was the key that opened the courthouse door for them. *Abrams*, 605 F.3d at 246. Mr. Curry testified that these cases are not highly desirable to bring in West Virginia because of the caps. Mr. Curry testified that he would not have accepted this case had it come to his office because of the strong chance that there would be a great deal of money spent to prosecute it and a strong chance that a court could preclude this case from ever getting to trial. This Court is cognizant that the contingency of fee factor also considers risks faced by attorneys undertaking the case. This case presented a neonatal malpractice claim that required Plaintiffs' Counsel to front over $307,000.00 in expenses, which even when repaid, will not be repaid with interest. Additionally, the case presented no guaranty of recovery for Plaintiffs,

even if they were very sympathetic to a potential jury, because the cause of

J.W.C.'s autism was uncertain, and because Defendants had theories and evidence

in their defense on the liability issues as well as causation. The prospect of

Plaintiffs recovering an award in this case was uncertain enough that, considering

the important purpose of contingency fees along with Plaintiffs' counsel's

expectations at the outset, this factor weighs in favor of the agreed upon 40%

contingency fee.

7.    **Time pressures imposed**. "Priority work that delays the lawyer's other legal work

is entitled to some premium. This factor is particularly important when a new

counsel is called in to prosecute the appeal or handle other matters at a late stage in

the proceedings." *Johnson*, 488 F.2d at 718. The circumstances of this case

presented no time pressures as contemplated by *Johnson*. As such, the time

pressures factor weighs slightly against the 40% contingency fee.

8.    **Award involved and results obtained**. "[T]he most critical factor in determining

the reasonableness of a fee award is the degree of success obtained." *Abrams*, 605

F.3d at 247. In this case, Plaintiffs' counsel obtained settlement amounts that

constitute a favorable result for both Plaintiffs, considering the contested issues of

liability and damages, as wells as the evidence favoring the positions taken by the

Defendants. Had the parties gone to trial, the sum could have been more, but it also

could have been less. The total settlement will be enough money to care for J.W.C.

for the rest of his life. Moreover, Ms. Frieson and Mr. Campbell both testified that

they believed the agreed upon 40% contingency fee is in the best interests of J.W.C.

and both asked this Court to approve the requested contingency fee. To be sure, "a

16

court must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected, even if the settlement has been recommended or negotiated by the minor's parent or guardian ad litem." *Abrams*, 605 F.3d at 247 (citation and quotation omitted). Nevertheless, Plaintiffs' counsel's success in settling this case for the agreed-upon sum, along with the parents' belief that the agreed upon fee is reasonable, all weigh in favor of awarding the agreed upon 40% contingency fee.

9.    **Experience, reputation, and ability of the lawyer**. Attorneys with experience or specializations are expected to receive larger compensation than less experienced attorneys. *See Johnson*, 488 F.2d at 719. Under this factor, the Court considers evidence submitted by the parties regarding the experience, reputation, and ability of Plaintiffs' counsel. Mr. Curry testified that he is knowledgeable of the experience, reputation and ability of Mr. Sims and that he considers him to be a good lawyer. Mr. Sims has been practicing law for 35 years and has substantial experience and abilities as a lawyer. Mr. Curry also testified that he has reviewed the work of the Beam Legal Team, LLC from its website and found they have enjoyed great success in prosecuting these kinds of cases. This Court is persuaded that the experience, specialization, reputation, and ability of Plaintiffs' counsel weigh in favor of 40% contingency fee.

10.    **Undesirability of the case**. "Undesirability and relevant risks of a case must be evaluated from the standpoint of plaintiff's counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight." *Williams*, 2015 WL 127862, at *9. Before the days of tort reform, Mr. Curry testified that this case is the sort of case that plaintiffs' attorneys did find highly desirable, but that is no

17

longer true. Mr. Curry testified that these cases require a great deal of money to prosecute, have less than average degree of success, and are no longer desirable because of these factors. Thus, the Court is persuaded that this factor weighs in favor of a 40% contingency fee.

11. **Nature and length of the professional relationship between lawyer and client**. There is no indication that Plaintiffs and their counsel had any relationship before this proceeding. In fact, Tierra Frieson was just 19 years of age at the time of the signing of the contingency fee agreement. As Mr. Curry testified, cases involving special needs trusts are lifelong cases while the trust exists. He testified that lawyers would receive calls about the trusts for years after the case is settled, with no additional compensation of any kind. Thus, the Court is persuaded that this factor weighs in favor of a 40% contingency fee.

12. **Fee awards in similar cases**. The contingency fee award in medical malpractice cases like this one—cases involving a minor or incompetent person—used to be 33.3%. *See Williams*, 2015 WL 127862, at *6, 11 (collecting cases and noting a one-third contingency fee is standard in personal injury cases involving incompetent, adult plaintiff). In other medical malpractice cases, a 40% fee is not unheard of, and indeed, may be appropriate in many circumstances. Particularly, a 40% fee might be appropriate where the plaintiff alleging medical malpractice is an adult with full mental capacity. An adult with full mental capacity is capable of bargaining with prospective counsel over attorney's fees. *Jackson v. United States*, 3:14-cv-15086, 2016 WL 3826379, at *10 (S.D. W. Va. July 13, 2016) (Chambers, J.). In cases like this, however, one plaintiff, an incapacitated minor, has no bargaining power and must rely on another plaintiff to negotiate a contingency fee.

18

Courts are duty-bound to protect the interests of minors and people who are incompetent. Other courts have found a 33.3% contingency fee was appropriate in similar cases, i.e., ones involving a plaintiff who is a minor or incompetent person. *See Williams*, 2015 WL 127862, at *6 (attorney charged 33.3% contingency fee instead of typical 40% fee because the plaintiff suffered a catastrophic bicycling injury leaving him incompetent); *Boatright ex rel. Boatright v. R.J. Cormon R.R. Co./Material Sales*, 244 Fed.Appx. 312, 314 (11th Cir. 2007) (affirming district court's finding that agreed-upon 40% contingency fee was excessive in light of incompetent plaintiff's Alzheimer's disease); *see also Gorham*, 2015 WL 2454261, at *4 (assuming 33.3% was common fee for representing client severely injured by amusement park ride but finding lower fee appropriate because, in part, attorney represented a minor). However, this Court finds that in certain cases, including this one, a 40% contingency fee may be appropriate.

To conclude, applying *Johnson's* factors to the instant case, the Court finds the requested 40% contingency fee is a reasonable attorney's fee for the settlement of the minor plaintiff's claims in this matter.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS** the Petition to Approve Settlements, Distributions and Other Relief. Considering J.W.C.'s interests in each proposed settlement, the Court FINDS and RULES:

1. J.W.C. is a disabled person as defined in 42 U.S.C. §1382c(a)(3).

2. It is appropriate for this Court to enter this Order establishing the J.W.C. Self-Settled

19

Special Needs Trust, pursuant to 42 U.S.C. §1396p(d)(4)(A).

3.  The J.W.C. Self-Settled Special Needs Trust is to be administered by the Trust Department of Citizens Bank of West Virginia, 211 Third Street, Elkins, West Virginia.

4.  Tierra Frieson is a disabled person as defined in 42 U.S.C. §1382c(a)(3).

5.  It is appropriate for this Court to enter this Order establishing the Tierra Frieson Self-Settled Special Needs Trust, pursuant to 42 U.S.C. §1396p(d)(4)(A).

6.  The Tierra Frieson Self-Settled Special Needs Trust shall be administered by the Trust Department of Citizens Bank of West Virginia, 211 Third Street, Elkins, West Virginia.

7.  The total amount of the proposed settlements with the Defendants is fair and reasonable.

8.  The structure of the proposed settlements is fair and reasonable.

9.  Petitioners' request to purchase two annuities is approved for additional funding for the J.W.C. Self-Settled Special Needs Trust is approved.

10. The expenses proposed in the Petition are fair, reasonable, and incurred in connection with this litigation.

11. Defendants shall pay the GAL fee after they are invoiced by her for her time and expenses.

12. Defendants shall reimburse David A. Sims in the amount of $3000.00 for the fees paid to Robin Triplett for the creation of the Special Needs Trusts.

13. For attorney's fees, a 40% contingency fee on the settlements is fair and reasonable.

14. Plaintiffs' counsel is directed to pay the reduced lien amounts in the amount of $28,903.80 to the entities holding said liens and provide evidence of payment to counsel for Defendants.

15. Plaintiffs' counsel may retain $50,000.00 of the settlement proceeds for a period of ninety days, as proposed in the Petition for the purpose of paying any unexpected expenses incurred in this litigation, provided that: when ninety days has elapsed, Plaintiffs' counsel shall repay the remaining retained settlement proceeds plus interest accrued to the J.W.C. Special Needs Trust.

16. Any settlement proceeds remaining after the proposed expenses have been paid shall be placed in the special needs trust for the benefit of J.W.C.

17. After all expenses have been paid, Plaintiffs' counsel shall submit to the Court under seal a closing statement reflecting its compliance with this Opinion and Order.

18. Petitioners Tierra Frieson and Austin Campbell are hereby authorized to execute full and final Releases of all Claims against all the Defendants.

Based on these findings and rulings, the Court **DISMISSES WITH PREJUDICE** this civil action against these Defendants. The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to counsel of record through the Court's electronic filing system.

ENTER:        January 10, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE